IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JULIE A. HERNANDEZ, as Administrator of the Estate of Robert Hernandez, | )<br>)<br>) |
| **Plaintiff,** | )<br>) |
| vs. | )   Case No.  08-cv-0925-MJR |
| CITY OF BELLEVILLE, an Illinois municipal corporation, and PARRISH MARSHALL, | )<br>)<br>)<br>)<br>) |
| **Defendants.** | ) |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

   A.   **Introduction and Procedural Background**

On December 31, 2008, Robert Hernandez filed suit against the City of Belleville and Parrish Marshall pursuant to 42 U.S.C. § 1983, alleging violation of his constitutional rights under the Equal Protection Clause of the United States Constitution.[1]  Specifically, Hernandez claims that Defendants discriminated against him because of his race (Latino or Hispanic) or nationality (Mexican)[2], or retaliated against him for a complaint he made to the Mayor of Belleville about the lack of police responsiveness.  He seeks compensatory damages, costs of suit and attorney's fees.

The case is set for trial on June 28, 2010.  On April 26, 2010, Defendants filed a suggestion of death, notifying the Court that Hernandez passed away on April 16, 2010 (Doc. 19).

---

[1] Two other Belleville police officers named as Defendants in this action were dismissed on May 14, 2010, for failure to prosecute (Doc. 23).

[2] For simplicity's sake, the Court will use the term "Hispanic."

1

On June 21, 2010, an amended complaint was filed substituting Julie A. Hernandez, as Administrator of the Estate of Robert Hernandez, as the named Plaintiff.[3] Now before the Court is Defendants' motion to dismiss and for summary judgment (Doc. 12). The matter is fully briefed and ready for disposition.

> B.    **Applicable Legal Standards**

Summary judgment is appropriate where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. ***Turner v. The Saloon, Ltd.*, 595 F.3d 679, 683 (7th Cir. 2010);** ***Durable Mfg. Co. v. U.S. Department of Labor*, 578 F.3d 497, 501 (7th Cir. 2009) (citing FED. R. CIV. P. 56(c). Accord *Levy v. Minnesota Life Ins. Co.*, 517 F.3d 519 (7th Cir. 2008)*; Breneisen v. Motorola, Inc.*, 512 F.3d 972 (7th Cir. 2008).** A genuine issue of material fact arises "if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." ***Egonmwan v. Cook County Sheriff's Dept.*, – F.3d –, 2010 WL 1610077, \*4 (7th Cir. April 22, 2010).**

The non-movant cannot rest on his pleadings, though. Rather, the non-movant must provide evidence on which the jury or court could find in *his* favor. ***Maclin v. SBC Ameritech*, 520 F.3d 781, 786 (7th Cir. 2008).** As the Seventh Circuit Court of Appeals explained recently:

> [T]he non-moving party must submit evidence that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006). The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the non-moving party.

***Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 531-32 (7th Cir.**

---

[3]To avoid awkward or strained constructions, the Court will refer to Robert Hernandez as Plaintiff.

2009).

In ruling on a summary judgment motion, this Court must view in the light most favorable to the nonmovant the evidence and all inferences reasonably drawn from the evidence. *Reget v. City of La Crosse*, **595 F.3d 691, 695 (7th Cir. 2010);** *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, **491 F.3d 625, 630 (7th Cir. 2007).**

In the case at bar, on Defendants' motion, the undersigned Judge must assess the evidence and reasonable inferences in the light most favorable to Hernandez. With these standards in mind, the Court addresses the February 17, 2010 motion, in which Defendants pray for summary judgment in their favor as to all claims brought against them by Hernandez.

### C. Analysis

Hernandez alleges that Belleville police were deliberately indifferent to his crime reports and retaliated against him when he complained to Belleville's mayor by selectively enforcing an ordinance against him. More specifically, Hernandez claims that the police failed to undertake proper investigation of two reports he made: (1) on February 26, 2007, his trailer was burglarized and approximately $15,000 worth of tools were stolen[4]; and (2) on March 3, 2007, persons trespassed on his property.[5] Hernandez claims that in spite of additional information he obtained regarding the identity of suspects in the burglary, the police refused to obtain a search warrant or

---

[4] According to the Detail Incident Report, the burglary occurred on February 26, 2007 and was reported on February 27. Doc. 16-21.

[5] Hernandez does not develop the issue of trespass. It appears that a white truck was on his property, that he called the police, and that the police responded. Hernandez submits that the police did not stop a white truck that they passed on the way to his house, but, given the plethora of white trucks on the streets, this is unsurprising - and is not evidence on which the jury or court could find in his favor.

3

otherwise act to identify, apprehend or prosecute the persons who burglarized his trailer.

On March 3, 2007, Hernandez complained to the Mayor of Belleville about the failure of the police to seriously investigate the February 27 theft. Hernandez alleges that, in retaliation for his complaining to the Mayor, Defendant Marshall notified him that he was in violation of a city ordinance regulating storage of inoperable vehicles, in that two trucks Hernandez owned and stored on his property were not registered or insured. Marshall told Hernandez that he was acting on a complaint by a neighbor and warned Hernandez that he would be cited for violating the ordinance if he did not dispose of the vehicles or get them registered and insured. According to Hernandez, no neighbor had filed a complaint about the vehicles, and no ordinance was violated because the ordinance does not apply to property that is zoned light industrial.

Hernandez submits that he called Marshall's attention to other unregistered vehicles in Belleville, but Marshall failed to take any action with regard to other vehicles. Hernandez claims that, as a result of Marshall's unequal enforcement of the ordinance, he was compelled to sell the two trucks quickly, for less than their actual value.

Hernandez's dissatisfaction with police response continued when, on March 30, 2007, he became involved in a dispute with a process server over a parking space. Hernandez asserts that the process server became hostile without provocation and pulled a handgun, threatening Hernandez with it. Although the original officer on the scene refused to charge the process server with any crime, ultimately another officer filed a complaint against him for disorderly conduct. Hernandez states that because he was not informed of the date of the hearing for the complaint, it was dismissed.

Hernandez's last specific claim is that, on August 18, 2007, his home was broken into

and vandalized. He alleges that an unnamed police officer responded and prepared a report but conducted only a cursory investigation.

Hernandez claims, generally, that there were several occasions between 2004 and 2006 when he reported other thefts of personal or business property, but Belleville police were deliberately indifferent to his reports.

In sum, Hernandez claims that his rights under the Equal Protection Clause were violated. He contends that when the homes of white residents are burglarized, the Belleville police make a concerted effort to find the perpetrator and that when white residents are threatened with a handgun, the police customarily arrest and seek the successful prosecution of the perpetrator for assault. He also claims that he was singled out for selective enforcement of Belleville's ordinance regulating the storage of inoperable vehicles because of animus based on race or nationality.

### 1. Count 1 - Equal protection claim against Belleville

To state a claim under 42 U.S.C. § 1983, Hernandez must allege that government officials, acting under the color of state law, deprived him of rights secured by the federal constitution or laws. But to state a § 1983 claim against a municipality, the complaint must allege that an official policy or custom caused the constitutional violation and, indeed, was "the moving force" behind the violation. ***Estate of Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007).** ***See also Johnson v. City of Kankakee*, 260 Fed.Appx. 922, 926 (7th Cir. 2008) (citing *Monell v. Department of Social Services of New York*, 436 U.S. 658, 691 (1978).**

So, unless there is an unconstitutional policy or custom, there cannot be official capacity liability against a city. Stated another way, municipal liability is limited to action for which the municipality is actually responsible. ***Sims*, 506 F.3d at 515 (citing *Pembaur v. City of***

*Cincinnati*, **475 U.S. 469, 479 (1986)).** "Misbehaving employees are responsible for their own conduct[;] 'units of local government are responsible only for their own policies, not for misconduct by their workers.'" *Id.* **(quoting** *Lewis v. City of Chicago***, 496 F.3d 645, 656 (7th Cir. 2007) (quoting** *Fairley v. Fermaint,* **482 F.3d 897, 904 (7th Cir.2007))**. There is no *respondeat superior* liability for municipalities under § 1983. *Belcher v. Norton***, 497 F.3d 742, 754 (7th Cir. 2007).**

"A local governing body may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook County Sheriff's Dept.***, --- F.3d ----, 2010 WL 1741111, \*6 (7th Cir. 2010) (citing** *Monell,* **436 U.S. at 690;** *Valentino v. Vill. of S. Chi. Heights,* **575 F.3d 664, 674 (7th Cir. 2009))**.

In May of this year, when discussing these factors in ***Thomas***, the Seventh Circuit declined to adopt bright-line rules defining a "widespread custom or practice." *Id*. The Court explained,

> As we stated in *Cosby v. Ward,* there is no clear consensus as to how frequently such conduct must occur to impose *Monell* liability, "except that it must be more than one instance," 843 F.2d 967, 983 (7th Cir. 1988), or even three, *Gable* [*v. City of Chi.,* 296 F.3d 531, 538 (7th Cir. 2002)] ("[T]hree incidents where vehicle owners were erroneously told that their vehicles were not at Lot 6 do not amount to a persistent and widespread practice.") (internal quotation marks omitted). But the plaintiff must demonstrate that there is a policy at issue rather than a random event. *Id*.

As to Hernandez's crime reports, he does not claim that the police did not investigate; rather, he contends that the investigations were inadequate. Regarding the February 26 burglary, the police incident report shows that Officer Henderson attempted to call Hernandez the day after the burglary was reported, but he was unable to leave a message because Hernandez's voice mailbox

6

was full. Doc. 16-21, p. 2. On the same day, Henderson contacted Pat Stitzel, who potentially had information about two persons of interest, Chris Hess and James Haller. *Id*. Henderson interviewed Haller and Hess as well as twice interviewing a third suspect, Portwood (identified as both "Richard" and "James"). He did a walk through at Hess's house; canvassed Hernandez's neighborhood and questioned neighbors; interviewed Hernandez; took statements from Hernandez and his daughter; discussed the case with his superior officers; created a case file and entered reports. Doc. 16-22, Henderson Dep. (summarizing). Moreover, in the course of another investigation, Henderson went to several pawnshops and included Hernandez's tools in his search, but he testified that he had no way of identifying any of the things that Hernandez had listed in his report. *Id*., 45:8-18. He stated that if he had seen one of the tools at a pawnshop, he could not have said with certainty that it was Hernandez's tool. *Id*., 45:14-18.[6] Henderson specifically remembered asking pawn shop owners whether anyone had come in to sell tools and also remembered faxing the list of Hernandez's items to two pawn shops. *Id*., 47:11-48:4. For "an extensive period of time," Hernandez called Henderson "early morning," "pretty much every day" to inquire about the case and to talk about race (Henderson is also a member of a minority group) or any number of other

---

[6]Henderson testified that Belleville Police repeatedly asked Hernandez to turn over receipts for the tools, but Hernandez did not turn over any receipts. Henderson Dep., 3:35-36. Additionally, according to Henderson, Hernandez did not give him any serial numbers, identifying marks or sufficient information to identify any of the items that Hernandez claimed were missing. *Id*., 18-19. Hernandez testified that he gave Henderson a list of items taken, but the list provided only replacement prices, and he had replaced none of the items on the list. Doc. 16-1, Hernandez Dep., 54:2-18; *see also* Doc. 12-1, 111:4-22. The list includes name brand tools such as a Bostich utility nail gun with a replacement value of $289.00 and a Dewalt 12" miter saw with laser, with a replacement value of $600.00. Doc. 12-1, Defendants' Exhibit 8. Hernandez conceded that he did not provide any receipts or documentation to Henderson because he could not locate anything. Doc. 12-1, 140:20-141:10. The Detail Incident Report shows only generic items taken: tools, power tool-shop, disc, air compressors, generator, roofing guns and nailers, with an estimated total loss of $7000.00. Doc. 16-21.

7

things. *Id.*, 60:19-22. Henderson testified that he had never heard a Belleville police officer make any statement indicating racial bias, had never heard any expression of hostility toward Hernandez or any member of his family, and was aware of no facts indicating any officer had treated Hernandez unfairly for any reason. *Id.*, 64:21-65:13.

Hernandez, unquestionably, had a number of interactions with the Belleville police, which he found unsatisfactory. In his deposition he testified that after an altercation with his neighbors, a young African-American male threatened him and his family with an ax. Doc. 16-1, Hernandez Dep. 27:2-7. Hernandez stated that he was defending his family when he got a sledgehammer from his truck and threatened the youth. *Id.*, 27:8-12. Hernandez thought that the police response was unacceptably slow ("waited a good ten minutes") and that the officers wrongly sympathized with the youth. *Id.,* 27:3-4, 12-14. The police gave Hernandez a ticket as a result of this incident, but it was dismissed. *Id.*, 27:14-15.

Within the 10 years prior to Hernandez's deposition, he could think of only one police officer who had made a comment to him that he considered racist. *Id.*, 106:15-16. Hernandez testified that Officer Bob Simms told him, "the reason why you get nothing done is because you're Mexican." *Id.*,106:21-23.

Lastly, Hernandez claims that a process server, David Fexer, pulled a gun on him, threatened to kill him, threatened to burn his house down while he was in it and called him a "wetback." Doc. 12-1, Hernandez Dep., 132:4-7. The altercation between Hernandez and Fexer began when Hernandez arrived home, and Fexer was parked in his parking place. *Id.*, 130:16-18. Hernandez stated that he did not call the police and did not know who placed the call, but two officers arrived during the altercation. *Id.*, 129:8-15; 131:2-7. Hernandez insisted on filing a

complaint, and Fexer was charged with disorderly conduct. *Id*., 132:25; 135:1-3; Doc. 16-20, Citation.

Fexer's account differs in that he testified that he was serving a summons and had parked at the address he was supposed to be serving when Hernandez pulled up and said, "you're in my spot." Doc. 12-5, Fexer Dep., 6:23-7:11. Fexer testified that he said he would move in a minute, whereupon Hernandez parked to block him in so he could not move his vehicle or get into the vehicle on the street side. *Id*., 7:12-18. According to Fexer, at that point, Hernandez got out of his vehicle and started walking away, saying he would move it when he was ready. *Id*., 8:18-21. Fexer stated that angry words were exchanged, and he felt threatened by both Hernandez and his son who had come to the scene. *Id*., 8:21-23. Fexer testified that it was he who called the police and that after he did so, Hernandez moved his vehicle. *Id*., 9:3-4. He stated that he did not display a gun, and that the only weapon he had on him was not a stun gun but a hand-held "little zapper thing" that he kept with him for pit bulls. *Id*., 12:21-13:3, 19-24. Fexer denied threatening to kill Hernandez, denied threatening to burn his house down and denied calling him a "wetback," stating that he himself is half-Hispanic. *Id.,* 15:2-18. Fexer felt as if the police officers favored Hernandez because Hernandez accused him of being a racist. *Id*., 16:22-25. Fexer was given a ticket and had to go to court. *Id*., 17:11-14. Hernandez appeared for the preliminary hearing but stated that he was not notified of the subsequent hearing, so the ticket was dismissed. *Id.,* 17:18-23.

Officer Crimm, who was the back-up or "cover" officer dispatched to the incident, testified that he did not see a gun and did not remember Hernandez saying that Fexer had threatened him. Doc. 12-6, Crimm Dep., 21:5-8; 24:18-25:1; 25:11-15.

In evaluating Hernandez's claims that his various interactions with the police show

that the City of Belleville has an official policy, widespread practice or custom that constitutes a "moving force" behind a constitutional violation, the Court need not check common sense at the door. Nothing in the history of Henderson's investigation into the tool burglary shows anything but a conscientious officer conducting an investigation. Even if Hernandez's dissatisfaction were justified and more could have been done, *e.g.,* crime scene officers collecting fingerprints, there is no evidence of any official policy, widespread practice or custom at issue that caused a constitutional violation.

Accepting as true Hernandez's account of his run-in with the African-American youth, Hernandez admitted to threatening the youth with a sledgehammer, and the ticket that he was issued was dismissed. The single instance in 10 years in which an officer made a remark that Hernandez considered racist is insufficient to sustain a § 1983 claim against the City. At most, the remark falls within the ambit of misbehavior by an employee for which the City is not responsible. ***See Sims*, 506 F.3d at 515 (citing *Pembaur,* 475 U.S. at 479)**.

Hernandez's altercation with the process server also fails to evidence a City policy, widespread practice or custom of discriminating against Hispanics. The police responded to the scene, assessed the situation, found Hernandez to be credible and issued Fexer a ticket for disorderly conduct.

Hernandez's complaint fares no better under the final analysis - liability based on a particular official having final policymaking authority. For purposes of local governmental liability under § 1983, whether a particular official has final policymaking authority is a question of state law. ***City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988)**. "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses

10

such authority, and of course, whether an official had final policymaking authority is a question of state law." *Praprotnik*, **485 U.S. at 124 (citing** *Pembaur,* **475 U.S. at 483 (1986))**.

In the instant case, all facts alleged and claims made implicate the actions of employees - whether individual police officers properly investigated Hernandez's complaints, selectively enforced ordinances or retaliated against him - and none shows an unconstitutional act caused by an official with final policy-making authority. Hernandez has failed to provide even a scintilla of evidence that the officers of whom he complains are policymakers for Belleville - or that any Belleville policymaker caused him a constitutional injury. Hernandez levels no claims against the only policymaker whose name appears among the factual allegations in the complaint, the Mayor of Belleville.

Lastly, assuming, *arguendo*, that Belleville does not do a good job enforcing the ordinance on unregistered vehicles, Hernandez has provided no evidence that Belleville has a policy or widespread practice of citing certain vehicles based on the race or nationality of their owners. Taken as a whole, Hernandez's claims amount to no more than random events and fail to demonstrate a policy or widespread practice of discrimination against Hispanics. So, the complaint states no claim upon which relief can be granted against the City, and summary judgment as to Count I is warranted.

### 2. Count II - Equal protection claim against Marshall

"[T]he Constitution prohibits selective enforcement of the law based on considerations such as race." ***Whren v. United States,* 517 U.S. 806, 813 (1996)**. "To show a violation of the Equal Protection Clause, plaintiffs must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." ***Chavez v. Illinois State***

11

*Police,* **251 F.3d 612, 635-36 (7th Cir. 2001) (citations omitted)**. "To prove discriminatory effect, the plaintiffs are required to show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class." *Id.* **at 636 (citations omitted)**. In *Chavez*, the Seventh Circuit explained that the plaintiffs could show discriminatory effect by showing that the defendant treated them differently from other similarly situated individuals by naming such individuals or through the use of statistics. *Id.*

Generally, "whether individuals are similarly situated is a factual question for the jury." *Lunini v. Grayeb,* **395 F.3d 761, 770 (7th Cir. 2005) (citing** *Harlen Assoc. v. Vill. of Mineola,* **273 F.3d 494, 499 n. 2 (2d Cir. 2001))**. "However, where it is clear that no reasonable jury could find that the similarly situated requirement has been met, a grant of summary judgment is appropriate." *Id.* **(citing** *Harlen Assoc.* **at** *id.***;** *McDonald v. Vill. of Winnetka,* **371 F.3d 992, 1002 (7th Cir. 2004) (affirming a grant of summary judgment where plaintiff failed to present a triable issue as to whether he was "similarly situated" to comparators);** *Bell v. Duperrault***, 367 F.3d 703, 709-10 (same);** *Purze v. Vill. of Winthrop Harbor,* **286 F.3d 452, 455-56 (7th Cir. 2002) (same))**.

Hernandez is a member of a protected class, but he is unable to satisfy the other two prongs of the test. His only claim against Marshall, the ordinance officer, is that Marshall threatened him with a citation for having unregistered vehicles on his property. In his deposition, Hernandez testified that Marshall showed him an unsigned, handwritten complaint that Hernandez had two unlicensed, untagged trucks. Doc. 12-1, Hernandez Dep., 73:16-75:3. Hernandez submits the March 2, 2007 complaint showing a first contact complaint for overcrowding and derelict vehicle

12

in which the complainant is identified as a neighbor. Doc. 12-3, pp. 7-9. A handwritten notation indicates that - as to overcrowding - the complaint was unfounded. Subsequently, Marshall told Hernandez that the complainant was his neighbor, Evette Phillips - a statement that Philips denied when Hernandez approached her about it. *Id.,* 77:6-78:3. Hernandez testified that he believed Phillips and thought that Marshall had lied to him. *Id.,* 78:4-11.

According to Hernandez, when he told Marshall about other vehicles in Belleville that were also unlicensed and untagged, Marshall responded that he did not see those vehicles but saw Hernandez's vehicles. *Id.*, 75:20-76:9. Hernandez stated that Marshall told him to tag the vehicles or get rid of them. *Id.*, 76:20-77:2. Hernandez was not ticketed for the untagged vehicles, but he felt threatened. *Id.*, 78:18-25. Hernandez called a city inspector and an alderman, but both city officials told him that they would not interfere with Marshall's actions. *Id.*, 79:21-80:2. As a result, Hernandez sold the trucks within a week after his conversation with Marshall. *Id.*, 79:6-80:14.

To show that he was treated differently from members of the unprotected class, Hernandez testified that Marshall took no action on two vehicles, untagged and in disrepair for eight years, that were kept by his neighbors, the Leohrs, who are Caucasian. *Id*, 89:24-91:5. However, Hernandez testified that he did not call the City to tell anyone about the Leohrs' untagged vehicles. *Id.*, 90:11-17. Instead, Hernandez complained to building inspectors, Steve Hickey and Kevin Horcher, neither of whom related the complaint to Marshall. *Id.*, 92:1-93:7. Hernandez stated that he specifically asked Hickey why a "white guy" could park a dumper on the street "and a Mexican guy can't even have it in the lot." *Id.*, 94:4-8. Hernandez also contrasted his neighbors' leaving vehicles on the street uncited for years in contrast to his bringing a dump truck home overnight only

13

and having a city employee knock on his door at 8:00 the following morning, advising him of the violation of the city ordinance. *Id.,* 96:16-23.

That the Leohrs kept unregistered vehicles on the street was corroborated by another of Hernandez's neighbors, George Millonas. Millonas testified that Leohr had a trailer on the street for two-and-a-half years and a purple car there for a year. Doc. 12-4, Millonas Dep., 18:21-19:21. Millonas, whose deposition was taken November 20, 2009, stated that the Leohr vehicles had recently been cited and that the car had been moved. *Id*., 19:2-23. Hernandez testified that after Millonas lodged his complaint with the City, "somebody came down approximately three days later, finally, and of course they made Kevin [Leohr] move his stuff." Hernandez Dep., 96:1-6.

Another deponent, Hazel Kitterman, testified that she believed it was "fairly common" to see unregistered vehicles parked on the street in Belleville. Doc. 16-19, Kitterman Dep., 18:20-19:4. The only specific instance of which Kitterman was aware in which an untagged or inoperable vehicle had been reported to Belleville was her own report of her nephew's (an African-American) leaving such a vehicle parked beside her mother's house. *Id*., 19:6-20; 21:15-23. She stated that she complained about it to the City and that she expected Marshall to haul it away because "[h]e's usually pretty good about it." *Id*., 20:17-23.

Having exhaustively reviewed the record, the Court finds that Hernandez failed to identify any similarly situated member of the unprotected class who was treated more favorably than he was. The key difference is that a complaint was called in regarding Hernandez's vehicles, but Hernandez never made a formal complaint regarding any of the vehicles he identified as derelict.

Hernandez's generalized complaints to Marshall about untagged vehicles on Centreville, Second and Third Streets, and South Second and Third Streets are vague and

14

insufficient to create an issue for trial. These complaints fail to show any discriminatory pattern because there is no evidence as to the race or ethnicity of the vehicles' owners, and there is no evidence that a formal complaint was made against the owners. Similarly, Hernandez did not file a complaint against the Leohrs regarding their untagged vehicles. Instead, he complained to building inspectors Horcher and Hickey, who he knew had no responsibility for ticketing derelict vehicles. Hernandez also stated unequivocally that Horcher and Hickey did not notify Marshall about the dump truck. *Id*., 92:20-93:4. So, Hernandez testified that he made no direct complaint about the Leohrs' vehicles to Marshall, nor even an indirect complaint that reached Marshall. In his deposition, Marshall stated that his work was generally complaint-driven and that he had no idea who had made the anonymous complaint regarding Hernandez's vehicles. Doc. 12-3, Marshall Dep., 13:1-22; 23:19-24:10; Doc. 12-3 Complaint Form.

George Millonas testified that Leohr's truck trailer had been cited and his car had been tagged. Doc. 12-4, Millonas Deposition, 18:21-19:12. Millonas complained to the City of Belleville or the Belleville Police Department about Leohr's truck trailer, and, after approximately two months, it was tagged and, subsequently, moved. *Id*., 25:13-19.

Stated simply, Hernandez has failed to establish that any members of the unprotected class are similarly situated because he filed no complaint against any owners of derelict vehicles and did not know the race or nationality of more than two owners of such vehicles. Moreover, when a complaint was filed, the City took action. The Court has no information regarding Millonas's race or nationality, but, assuming that he is Caucasian, the facts still do not support a finding that Marshall acted from a discriminatory or retaliatory motive. Millonas called the City or the Police Department and made a proper complaint - similar to the complaint filed against Hernandez - and

15

Hernandez did not.

Hernandez submitted no evidence that the area in which his vehicles were parked was zoned light commercial and that the ordinance did not apply in such an area. The evidence before the Court cuts against such a finding because the Leohrs' vehicles parked in the same area were cited and forced to move.

Furthermore, the pictures Hernandez has offered in evidence of derelict vehicles cannot be considered by the Court. Materials submitted for summary judgment must be admissible. ***Whitted v. General Motors Corp.,* 58 F.3d 1200, 1204 (7th Cir. 1995)**. That is, the use of these materials is not authorized unless they are either (1) identified by affidavit as being authentic or (2) otherwise admissible. ***Martz v. Union Labor Life Ins. Co.,* 757 F.2d 135, 138 (7th Cir. 1985)**. Hernandez's exhibits are not certified or accompanied by a sworn statement as to their authenticity. Second, the exhibits are lacking in context as to where they were taken as well as who the owners of the vehicles are (including race and nationality).[7] In short, the pictures are inadmissible, and even if they were admissible, they are not evidence on which the trier-of-fact could reasonably find for Hernandez.

In sum, Hernandez has failed to provide evidence that raises a genuine issue of material fact on the similarly-situated requirement of his claim. He has not shown that Marshall treated him differently from other similarly situated individuals by naming such individuals or through the use of statistics. So, the complaint states no claim upon which relief can be granted

---

[7]In his deposition, Hernandez identified a derelict Volkswagen, which he said had remained at the same place for ten years, that was owned by a white person. Hernandez Dep., Doc. 12-1, 58:10-59:7. Of other vehicles, Hernandez testified, "I do not know the registered owners of them." *Id.*, 69:22.

against Marshall, and summary judgment as to Count II is warranted.

### D. Conclusion

For the above-stated reasons, the Court **GRANTS** summary judgment in favor of Defendants, City of Belleville, Illinois and Parrish Marshall, and against Plaintiff Julie A. Hernandez, as Administrator of the Estate of Robert Hernandez, and **DISMISSES** this action with prejudice. This case is closed.

**IT IS SO ORDERED.**

**DATED this 24th day of June, 2010**

                                        s/Michael J. Reagan
                                        **MICHAEL J. REAGAN**
                                        **United States District Judge**